UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>v.<br><br>David Larry Rasmussen,<br>a/k/a "David Lary Rasmussen,"<br><br>Defendant. | File No. 13-cr-134 (DSD/TNL)<br><br>**REPORT**<br>**&**<br>**RECOMMENDATION** |

Thomas Calhoun-Lopez, **United States Attorney's Office**, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415 (for the Government); and

James S. Becker, **Office of the Federal Defender**, 300 South Fourth Street, Suite 107, Minneapolis, MN 55415 (for Defendant).

This matter is before the Court, United States Magistrate Judge Tony N. Leung, on Defendant David Larry Rasmussen's Motion to Suppress Statements (ECF No. 35) and Motion to Suppress Fruits of Unlawful Arrest and Search and Seizure (ECF No. 36). This matter has been referred to the Court for report and recommendation pursuant 28 U.S.C. § 636 and D. Minn. LR 72.1(a)(3)(A).

This Court held a hearing on the Motions. (ECF No. 40.) Assistant United States Attorney Thomas Calhoun-Lopez appeared on behalf of the Government. James Becker appeared on behalf of Defendant. Officer Brian Lunz of the Mountain Lake Police

1

Department, Officer Joseph Larson of the Sioux Falls Police Department,[1] and Special Agent Glenn Moule of the Federal Bureau of Investigation testified. The following exhibits were offered and received:

1. Government Exhibit 1 is a search warrant for Defendant's residence, including the application and supporting affidavit.

2. Government Exhibit 2 is a Miranda Warning Waiver form signed by Defendant on October 28, 2012.

3. Government Exhibit 3 is a Miranda Warning Waiver form signed by Defendant on October 29, 2012.

4. Government Exhibit 4 is a video of the October 28 interview with Defendant.

5. Government Exhibit 5 is a video of the October 29 interview with Defendant.

6. Government Exhibit 6 is a Consent to Assume Online Identity Authorization Form signed by Defendant authorizing Agent Moule to assume Defendant's online identity for three email addresses.

7. Defendant's Exhibit 1 is a Narrative Report filed by Officer Lunz with the Mountain Lake Police Department describing his encounter after being dispatched to Defendant's residence.

Based upon the record, memoranda and proceedings herein, this Court will recommend that Defendant's Motions be denied.

---

[1] Officer Larson is currently employed by the Sioux Falls, South Dakota police department. At the time of the events in question he was a police officer in Mountain Lake, Minnesota.

## I. BACKGROUND

### A. Dispatch to Defendant's Residence

On the evening[2] of October 27, 2012, Officer Brian Lunz received a dispatch call directing him to an address in Mountain Lake, Minnesota. (Application 1-2, Gov't Ex. 1.) The dispatch indicated that C.B. was at the address and wanted to speak to the police. (*Id.*) At that time, C.B. lived at the house with Rasmussen. (*Id.*) Officer Lunz arrived in his squad car, parked across the street, and walked to the driveway where C.B. was waiting for him. (*Id.*) Officer Lunz testified that C.B. told him that he needed to show him some pictures on the cell phone he was holding. Officer Lunz testified that C.B. was standing two to three feet away from him, hitting a few buttons on the phone; he then held it up for Officer Lunz to see. On the phone was a picture of a pre-pubescent girl, approximately 2 years old, laying naked on a bed. (Def. Ex. 1.) Officer Lunz testified that C.B. stated that the phone belonged to Defendant and then handed it to Officer Lunz for him to see it better.

Officer Lunz testified that he asked C.B. if there were more such pictures on the phone; C.B. said that there were. C.B. then took the phone back and proceeded to show Officer Lunz how to scroll through the phone to look at more pictures. When Officer Lunz asked C.B. how he got the phone, C.B. stated that A.K., Defendant's stepdaughter, gave him the phone and he proceeded to call the police. (*Id.*)

---

[2] At the hearing, Officer Lunz testified that he received the call in the early evening. His police report, however, indicates that he received the call at approximately 10:11 p.m. (*See* Def. Ex. 1.)

Officer Lunz then contacted the chief of police for instructions on how to proceed.[3] (*Id.*) The chief told Officer Lunz that he was sending Officer Joseph Larson to assist. (*Id.*) Office Larson arrived around 11:00 p.m. wearing jeans, a shirt that said "Police," and his gun belt. (*Id.*) The two officers determined that a warrant was needed to search Defendant's house. (*Id.*) Officer Lunz took the phone to the police station, checked it into evidence, and began applying for a search warrant. (Application 1-2.) Officer Larson remained at the scene to ensure that no one entered the house and tampered with evidence before the warrant could be executed. (*Id.*)

Officer Larson testified that Defendant arrived at the house shortly before midnight, just before the officers were going to execute the warrant. Defendant had been at the hospital with his wife due to a medical emergency. (*Id.*) Officer Larson testified that he approached Defendant, identified himself, and told Defendant why he was there. Officer Larson testified that he then asked Defendant if Defendant was willing to go to the police station to talk. Defendant agreed and drove himself to the police station.

### B. Defendant's First Custodial Interview

Officer Larson first interviewed Defendant shortly after midnight on October 28, 2012. When he arrived at the police station, Defendant was taken to the interview room. Defendant sat down in the room and, before any questions were asked, Officer Larson read Defendant his *Miranda* rights. (Gov't Ex. 4.) Defendant then signed a form acknowledging that he understood and waived his rights. (Gov't Exs. 2, 4.)

---

[3] At the hearing, Officer Lunz stated that he went to the chief's house, which was only a block away. In his report, however, he wrote that he called the chief. (*See*. Def. Ex. 1.)

Officer Larson testified that although he was armed at the time of the interview, he never took his weapon out of his holster. He testified that he made no physical contact with Defendant and did not engage him aggressively. Officer Larson testified further that although Defendant seemed nervous, he was not shaking or sweating and showed no signs of extreme stress. Defendant was cooperative and coherent with no indications of intoxication. Defendant never complained of his well-being and was not denied water, tobacco, or use of the bathroom. A video taken of this interview corroborates this testimony of Officer Larson. (*See* Gov't Ex. 4.)

After the interview was complete, Defendant left the police station and returned to his residence. Following the execution of the search warrant of Defendant's house, Officer Larson arrested Defendant. At the time of the arrest, both Defendant and A.K. advised Officer Larson that Defendant required his medication, and Officer Larson ensured that he took it with them. It is unclear from the testimony and the record before the Court what the medication in question was and what condition Defendant had that required it.

### C. Defendant's Second Custodial Interview

On October 29, 2012, shortly before noon, Officer Larson again interviewed Defendant, this time at the Cotton County Jail. Officer Larson wore civilian clothes and his gun belt to the interview. Upon entering the interview room, Officer Larson removed Defendant's handcuffs. Officer Larson again advised Defendant of his *Miranda* rights, and Defendant signed a new form acknowledging and waiving his rights. (*See* Gov't Exs. 3, 5.)

In this second interview, Defendant again showed no signs of extreme stress or intoxication and made no complaints about his health. Officer Larson never raised his voice. Nor did he threaten or deny Defendant water or use of the bathroom. Throughout the interview, Defendant appeared coherent and lucid. Officer Larson testified that the interview could be described as a "casual conversation," and video of the interview corroborates his testimony. (*See* Gov't Ex. 5.) Officer Larson testified that the purpose of this second interview was to gather evidence.

### D. Defendant's Consent Allowing the FBI to Assume His Online Identities

In early November of 2012, Officer Larson notified F.B.I. Special Agent Glenn Moule about Defendant. On November 7, 2012, Agent Moule requested Defendant's consent to assume his online identity. Agent Moule sought the consent in order to change the passwords to Defendant's online identities in order to preserve any evidence that the accounts contained. Agent Moule testified that he first contacted State Public Defender John Scholl over the phone to get consent. Agent Moule then faxed Scholl a blank copy of a "Consent to Assume Online Identity Authorization Form." Agent Moule testified that Scholl then told him he could approach Defendant about signing such a form.

Agent Moule testified that he and Officer Larson then approached Defendant at his residence on November 7, 2012. The two arrived in a private car. Agent Moule knocked on the door and identified himself as an F.B.I. agent to Defendant. Agent Moule testified that he then asked Defendant's consent to assume his online identities; Defendant said yes and signed the authorization form. (*See* Gov't Ex. 6.)

Agent Moule testified that Defendant did not appear intoxicated or disoriented. Defendant did not complain about his health, and no physical contact was made. He was not threatened with or advised of adverse consequences that would result if he did not sign the form. Defendant's wife was present at the residence during the encounter. Although Agent Moule was armed, he was in civilian clothes and his weapon was concealed.

Defendant now seeks suppression of the evidence obtained from the cell phone and subsequent evidence discovered in Defendant's home. He argues: (1) law enforcement's seizure of the cell phone was unlawful because C.B. did not have actual or apparent authority to consent to the phone's seizure; (2) no other exception to the warrant requirement saves the seizure of the cell phone; (3) other evidence obtained must be suppressed as "fruit of the poisonous tree" because the unlawful seizure of the cell phone formed a substantial basis for subsequent search warrant applications; and (4) Defendant's statements to law enforcement during the two interviews were involuntary.

## II. ANALYSIS

### A. Seizure of Defendant's Cell Phone

#### 1. C.B. Was Not a Government Actor

Defendant first argues that C.B. did not have permission to use his personal cell phone, and that therefore, any apparent authority based on C.B.'s possession of the phone is unreasonable. Essentially, Defendant argues that C.B. was a "government actor" for Fourth Amendment purposes. *See Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 604 (1989). The Fourth Amendment's protections, however, do not apply to a seizure

"effected by a private party on his own initiative." *United States v. Wiest*, 596 F.3d 906, 910 (8th Cir. 2010) (quoting *Skinner*, 489 U.S. at 604). To determine whether a private citizen is subject to the Fourth Amendment, courts consider "whether the government had knowledge of and acquiesced to the intrusive conduct; whether the citizen intended to assist law enforcement or instead acted to further his own purposes; and whether the citizen acted at the government's request." *United States v. Inman*, 558 F.3d 742, 745 (8th Cir. 2009) (quotation and citation omitted).

In this case, Officer Lunz had no knowledge of C.B.'s conduct until he was shown a photograph that he knew from his experience was child pornography. Officer Lunz was in a driveway responding to a 911 call and speaking with a concerned citizen. The person who placed the call told Officer Lunz that he had to see something and held out a cell phone. On the phone, Officer Lunz saw a picture of a prepubescent girl lying naked on a bed. Officer Lunz did not prompt C.B. to show him the contents of the phone; C.B.'s decision to show law enforcement the contents of the phone was a voluntary and unsolicited act. *See, e.g.*, *United States v. Benoit*, 713 F.3d 1, 10 (10th Cir. 2013) (finding informants not to be government actors because law enforcement "never directed [them] to do anything" and "[a]ll their actions were voluntary"). In short, there is no evidence before the court (1) that law enforcement knew of or acquiesced in C.B.'s seizure of Defendant's phone; (2) that C.B. "intended to assist law enforcement" rather than to further his own purposes; or (3) that C.B. acted "at the government's request." *Wiest*, 596 F.3d at 910 (quoting *Inman*, 558 F.3d at 745). Accordingly, the Court determines that C.B. was not a "government actor" for Fourth Amendment purposes, and therefore,

8

Defendant's Fourth Amendment protections do not extend to C.B.'s seizure of Defendant's personal cell phone.

### 2. Plain View Exception to the Warrant Requirement

Defendant also argues that Officer Lunz's seizure of the cell phone was unreasonable because he did not have a warrant. Although warrantless searches are *per se* unreasonable, *United States v. Brooks*, 715 F.3d 1069, 1075 (8th Cir. 2013), the plain view doctrine permits officers to "seize an object without a warrant if they are lawfully in a position from which they view the object, the incriminating character of the object is immediately apparent, and the officers have a lawful right of access to the object." *United States v. Muhammad*, 604 F.3d 1022, 1027 (8th Cir. 2010); *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993). The incriminating character of an object is "immediately apparent" when an officer has "probable cause to associate the object with criminal activity." *United States v. Darr*, 661 F.3d 375, 379 (8th Cir. 2011). In the Eighth Circuit, discovery of the evidence must be inadvertent for the plain view exception to the warrant requirement to apply. *United States v. Raines*, 243 F.3d 419, 422 (8th Cir. 2001).

In this case, Officer Lunz's discovery of the incriminating photograph on Defendant's phone was inadvertent. He did not travel to the location in the hopes of finding child pornography; he was dispatched after a concerned citizen called the police. While standing in the driveway, C.B. held out Defendant's phone to display the incriminating photograph without any direction or request from Officer Lunz. The incriminating character of the photograph was immediately apparent and gave Officer Lunz probable cause to believe that the phone contained evidence of child pornography.

C.B. informed Officer Lunz that there were more photographs depicting child pornography on the phone and showed Officer Lunz examples. Finally, Officer Lunz "had a legitimate interest in preserving the evidence" from possible destruction. *United States v. Beasley*, 688 F.3d 523, 530 (8th Cir. 2012).

In arguing for suppression, Defendant relies on factual discrepancies between (1) the testimony and the recorded evidence regarding what time of night the initial seizure occurred, and (2) whether Officer Lunz drove to the chief of police's house or simply called him. The Court agrees that discrepancies exist between the testimony given at the motions hearing and the documentary evidence introduced into the record. Despite these discrepancies, however, neither the timing of the seizure nor the manner that Officer Lunz contacted the police chief has any effect on this Court's analysis.

Under the totality of the circumstances, Officer Lunz had a lawful right to view the photograph on Defendant's phone, the incriminating character of which was immediately apparent. Accordingly, his warrantless seizure of the phone is permissible pursuant to the plain-view exception to the warrant requirement, and Defendant's motion must be denied.

### B.  Fruit of the Poisonous Tree

Defendant argues that the fruits of the searches of Defendant's home must be suppressed because the warrant applications were based in part on the seizure of the cell phone. Because this Court has determined above that Officer Lunz's seizure of the phone did not violate the Fourth Amendment, Defendant's argument for suppression of

evidence obtained as a result of warrants based on evidence obtained from the phone must fail. *See, e.g.*, *United States v. Hager*, 710 F.3d 830, 839 (8th Cir. 2013).

### C. Defendant's Statements to Law Enforcement

Defendant also argues that his statements to police during his custodial interrogations on October 27 and 28 were involuntary and must be suppressed. "Statements to law enforcement authorities are voluntary if they are the product of an essentially free and unconstrained choice by [their] maker." *United States v. Vinton*, 631 F.3d 476, 482 (8th Cir. 2011) (alteration in original) (quotation omitted). "A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." *United States v. Boslau*, 632 F.3d 422, 428 (8th Cir. 2011) (quotation and citation omitted). To determine if a confession is voluntary, courts consider the totality of the circumstances, including: the conduct of the officers and the degree of coercion; the length, location, and continuity of the interrogation; and the characteristics of the accused such as maturity, education level, and physical and mental condition. *United States v. Vega*, 676 F.3d 708, 718 (8th Cir. 2012).

After examining the totality of the circumstances in this case, this Court finds that Defendant's statements were voluntary. Throughout both interviews, Officer Larson remained calm and cordial. He never raised his voice, threatened Defendant, or made or implied any promises. Officer Larson remained seated throughout the interviews except when he rose to leave the room. Defendant also notes that he did not have his medication at this interview. A careful review, however, leads the Court to determine that the

11

voluntariness of Defendant's statements was not affected by either the fact that Defendant had just returned home from the hospital or the fact that he did not have his medication at the first interview. Even without his medication, Defendant did not appear to be impaired throughout the interview. *Cf. United States v. Dehghani*, 550 F.3d 716, 720-21 (8th Cir. 2010) (determining that an interview was voluntary as medications taken by defendant that day did not appear to impair him). Throughout both interviews, Defendant appeared alert. He consistently responded to Officer Larson's questions without pause or hesitation, and his responses were appropriate, detailed, and fit the context of the interview. Furthermore, Defendant's answers to questions demonstrate knowledge of file sharing websites and the internet, suggesting at least average intelligence. *See id.* at 720 (finding rudimentary knowledge of the internet suggests average intelligence).

Considering the totality of the circumstances, including Officer Larson's conduct and Defendant's characteristics, Defendant's statements to Officer Larson were voluntary. Accordingly, Defendant's Motion to Suppress Statements must be denied.

### III. RECOMMENDATION

Based on the foregoing and all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Defendant's Motion to Suppress Statements (ECF No. 35) be **DENIED**; and

2. Defendant's Motion to Suppress Fruits of Unlawful Arrest and Search and Seizure (ECF No. 36) be **DENIED**.


Date: October 9, 2013  _s/ Tony N. Leung_____
Tony N. Leung
United States Magistrate Judge
District of Minnesota

*United States v. Rasmussen*
File No. 13-cr-134 (DSD/TNL)

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and by serving upon all parties written objections that specifically identify the portions of the Report to which objections are made and the basis of each objection. The Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals. Written objections must be filed with the Court before **October 24, 2013**